Formulas, Inc. v. Now Health Group Formulas, Inc. v. Now Health Group Formulas, Inc. v. Now Health Group Formulas, Inc. Now on Jarrow we've got an additional counsel in on this and the clerk's notes to me are sort of cryptic on the timing. How are you going to divide up that argument? Your Honor, Mark Tarantona. I'm going to be addressing the argument on the appeal. My co-counsel Thomas Reckin is going to be addressing the inequitable conduct issues on the Frost Appeal. We're going to divide it 9. I'm going to reserve 3 for rebuttal on the appeal. He's going to have 3 for the inequitable conduct issues. Okay. You may begin. May it please the Court. Softgel argues that Jarrow Formulas does not infringe because the melting point data of Fig. 4 is based on binary mixtures and because Jarrow Formulas did not take into account all of the ingredients. First, with respect to infringement, we want to point out that Jarrow Formulas is not only relying on the melting point data of Fig. 4, but also is relying on Softgel's own testing of the accused supplement as reported in its promotional literature. And if we look at the... What evidence do you have that suggests that Softgel's... I forget what the thing is... that it actually lowers the melting point as opposed to just dissolving? Your Honor, the melting point data of Fig. 4 in the patent shows the relative weight  of the delimitine. Okay. I understand that. So you've got stuff in your patent. Is there anything else or are you just requiring us to make a jump from that is how these things operate to looking at the ingredients they listed on their product and assuming that the melting point must have been reduced there too? Well, we're relying in part on the melting point data, and that is actual data in the patent. And we're relying on the fact that that data shows that they have way more than the amount of delimitine required to achieve the claimed melting point reduction. All I want to know is, because I think I'm right, you've got that data and then you've got their list of ingredients, which includes the two things plus a bunch of other things and all their descriptions about how these crystals are dissolved or something. That's all you have. Yes. We have their testing. Their testing shows that they subjected the accused supplement to a battery of microscopic examination, and that when they examined it under microscope, it was completely liquid, and they could not even find sub-micron particles. But there's no testing of what the melting point is. Well, the testing of the melting point is the melting point data in the patent. The patent shows... I think Judge Hughes said something that I think you affirmed, and that is you're relying on a subset of the ingredients, aren't you? Not on the entire list of ingredients. In the accused soft shell products. Well, we are relying on the fact that they have substantially more delimitine, at least two times, if not three, if not five times the amount of delimitine as compared to CoQ10. And we're relying on that to show... Let me try again. Is the answer to Judge Wallach's question yes? That you're relying on a subset? That's right. Big four. Big four only has two elements, right? That's right, Your Honor. The volatile essential oil and the ubiquinone. That's right. It doesn't have the other ingredients that are included in soft shells accused products. That's correct, Your Honor. Now we're left with a gap in the record in trying to figure out exactly what is the melting point of all of those ingredients that are mixed together in soft shells accused products. We submit, Your Honor... Is that right? Well, we submit that there's not a gap. We submit that if you look at the body of evidence, that it's entirely reasonable to conclude, and a reasonable juror... But there's no specific evidence that soft shells product with all of its ingredients, not just the two, has a lower melting point. You're asking us to infer that it has a lower melting point based upon the data in your patent. The other... Look, I... Yeah, we are asking you to... I assume what you're arguing is that that's enough evidence for a reasonable juror to conclude that the patent's incorrect. Yes, Your Honor. The other piece of evidence, though, and we submit this is important. The microscopy examination examined the formulation at room temperature and couldn't find submicron particles showing that the CoQ10 is melted and liquid. Well, this goes back to the claim construction now. Yes, Your Honor. And that's something I'm trying to understand a little more. The court construed reducing the melting point as a change in its physical properties, i.e. a reduction in its melting point and not merely dissolution, right? So that tells me that the district court concluded that there's a difference between reducing the melting point and dissolution. That's right, Your Honor. And you haven't appealed that claim construction. We've not. And so I don't know if this is correct as a matter of science, but this is the world we're living today in, in this courtroom, that there's these two distinctions, reducing the melting point and dissolution. Yes. We know that the accused product, there's a dissolved ubiquinone in some essential oil among other ingredients. Yes. We don't know, though, if that result of some liquid form is due to a reduction in the mixture's melting point, or if it's due to something else that I'll just call dissolution. Well, let's look at the evidence, Your Honor, because we submit that there is. But do you understand my concern? I do, Your Honor. And there is no evidence that it merely dissolves. What Softgel argues is that... There's no evidence to the other side either. That's the problem. We submit that there is. We submit that the melting point data, the FIG-4, shows that when you have those relative amounts of CoQ10 to delimiting, or delimiting to CoQ10... What's the effect of the other ingredients? The effect is nothing. How do we know? Sorry. I see you. Number one, it was reasonable for our expert witness to assume there was no effect, because when he first compared it to the melting point data, saw what effect that would have. Then, he looked at their test results and saw that it was, in fact, liquid. At room temperature, it was reasonable to conclude that it was melted and that it was liquid. Why? Is that the only possible scenario? Isn't it possible that these other ingredients might dissolve the u-fiquinone, but not lower its melting point? Well, first of all, Your Honor, we're not required to show that it's the only possible scenario. We're only, and we're not required to disprove every hypothetical possibility of non-infringement. So, once you got the claim construction you did that distinguished dissolution from lowering the melting point, don't you have to have at least some evidence to show that it isn't just dissolved, that it is the melting point's lowered? Well, we need to be able... That's an issue of fact, because soft gel needs to attack our expert's report, and it only dissolves and doesn't melt. The only evidence that soft gel has is a patent. They have no other evidence, and they claim that they patented a theory of dissolving without melting. Well, the patent office has rejected that patent, and the patent office has specifically debunked that theory. Here's another theory. It's called Motoyama. And Motoyama, which, I guess, was known in the prior arts in 1982, several decades ago, expressly discloses the insight that you can mix ubiquitin with some kind of volatile essential oil at room temperature at a 50-50 rate, and then you'll have this liquid at room temperature. So, if you're trying to... It seems to me the Q's product is doing what Motoyama is doing. And you're trying to say, on the one hand, Motoyama doesn't anticipate your claim, however you've construed your claim, but at the same time, your claim is infringed by the Q's supplement. And I'm just completely at a loss there. It seems like this is a needle you're trying to thread that I don't know if there's a gap there for you to thread. Well, the issue of Motoyama is not an appeal with respect to validity, but I appreciate your point, Your Honor. And if I remember correctly, Motoyama doesn't recognize or provide the sufficient proportions to achieve the melting point reduction. Right, it doesn't... Well, it does mention that it's a knowledge, it's a matter of fact that reducing the melting point improves absorption. There's a passage in Motoyama that says that. But you're right that it doesn't expressly say, by mixing ubiquinone with volatile essential oil, we are reducing the melting point of the mixture. But nevertheless, you're trying to escape Motoyama by, at the same time, the result that Motoyama has, a liquid mixture at room temperature, looks identical to me to the Q's product liquid at room temperature. And let me throw something else in before your time runs. On page 52 of your brief, you say that the district court's exclusion of the Williams declaration certainly tainted Williams' opinions in the eyes of the district court. Do you have any proof of that? What evidence shows that it was tainted? The exclusion of the Williams declaration prevented Dr. Williams from being able to effectively rebut the attack on his opinion by pointing out that when you look at the master formula sheets, the master formula sheets show that the other... No, no, no, I'm not talking about the evidence that what did or did not come in. You say his testimony was tainted, the evidence that did come in. What evidence do you have of that? I'm sorry, Your Honor, I'm trying to find the passage. I'm on page 52. It's at the bottom of 52 in the blue brief. One line up from the bottom. Yeah, the ultimate point we're making there is that it will cause harm at trial by having that excluded, okay? And it certainly tainted, we believe it tainted the district court's view of the evidence because it didn't have the benefit of Williams' analysis to rebut this other ingredient theory. You didn't say that. You said it tainted his opinions. He gave other opinions. Are you saying now that it did not taint his opinions in the eyes of the court? I just want to be clear on that because when you say something like that... Well, yeah, I believe, Your Honor, that it did. It tainted his opinions because Softgel attacked his opinions based on the other ingredients. And because he wasn't allowed to rebut that attack, the net effect would be a tainting of his opinions in the eyes of the district court. That's the point there. And that's why it would be prejudicial. And that's why it would be prejudicial at trial not to be able to rebut those opinions. As a matter of science, can you actually change the inherent properties of a compound by reducing its melting point? The claim says reducing the melting point of ubiquitin O. Yes. So now I'm thinking of something like water. Can you somehow do something to water to mutate its inherent properties so that you can reduce the melting point of water? In all candor, Your Honor, I don't know the answer with respect to water. What I would submit with respect to this claim's invention is by reducing the melting point of the CoQ10, it will then be liquid when it's ingested into the body. That's the purpose of the claim. But is it really the melting point of the ubiquitin that's reduced or it's the melting point of the combination, the solution of the ubiquitin and the oil? It's only the melting point of the ubiquitin. If you put the ubiquitin in the presence of a sufficient amount of the delimitin, it's going to reduce the melting point, such that if you have two times the amount of delimitin as compared to CoQ10, your melting point will be at about room temperature. It will be liquid at room temperature. The solution will be liquid. Mr. Garitano, you've eaten all your response time. Do you want to eat your co-counsel's time? I do not, Your Honor, and I appreciate it. Thank you. May it please the Court. My name is Therese Anker and I represent Softgel Technologies. In this case, the district court properly granted summary judgment of non-infringement. The patent owner, JFI, failed to create a fact issue on an essential element of its case, namely whether the accused product's melting point reduction limitation. JFI's admissible evidence on summary judgment was contained in the February and March reports of its expert, Dr. Robert Williams. I think we got it on your friend's side, that there really is basically two pieces of evidence, the figure four from their patent that has the data about the melting point, and then all of the stuff from your marketing materials, ingredients that your stuff is liquid and dissolved. Why isn't, given the amount of lemon oil or whatever you have in your products and ubiquitin, that enough to create a triable issue of fact? Can't the jury make the inference that because there's this data from their patent and your stuff has the right proportions that the melting point must have been reduced? It is not sufficient to create a fact issue, Judge Hughes, for at least two reasons. One reason is that the 786 patent itself is a highly technical document. It's not a document that a layperson can read and understand. Someone will have to, an expert, would have to review that document, analyze the DSC chromatography that's going on, interpret that, and draw some conclusion about a two-component mixture. That's what they tried to do with the untimely May 4 declarations of Williams and Nazal, recognizing they had that problem, but by then it was too late. It was after the close of fact discovery, after the deadline for expert disclosures, after the close of expert discovery, after we had taken Dr. Williams' deposition, and at the last day to file summary judgment motions, they brought in that testimony. The district court was well within its discretion under Ninth Circuit law, which is particularly wide latitude, well within its discretion in excluding that from evidence. So that's one reason. The other reason is that it's undisputed, and Williams himself acknowledged this, that you can get to a liquid through at least a couple of means. One is melting, the other is dissolving. There's a passage in his deposition where he even says, and we cite it in our papers, where he even says, I don't know why it says melt. One of skill would understand it's dissolving in that essential oil. So you can't look to the end result liquid and say that is probative of melting point reduction when it's equally probative of dissolving, and Williams actually said it's dissolving. Just looking at the end result doesn't create a fact issue. You have to explain, because they didn't get a patent on any liquid composition. They got a patent on a specific way of getting their melting point reduction, and they need to put on evidence, create a fact issue that that limitation is met. They have no such evidence, and as the court pointed out in its questioning, the construction of melting point and melting point reduction is not challenged on appeal. So there are two ways to get there, dissolving and melting, and just pointing to the end result doesn't create a fact issue that the claim limitation is met. There should have been some testing. There should have been at a minimum analysis that took into account all the ingredients of the accused products as the file history and the spec make clear that even one ingredient can neutralize a melting point reduction. So we believe that the district court properly granted summary judgment of non-infringement. The evidence they had on summary judgment was based on the wrong claim construction that melting and dissolving were used interchangeably in the patent. That's very clear from the record. The re-examination of your patent... Yes, Your Honor. The PTO seems to be equating reducing the melting point with dissolving, right? The way I interpret those proceedings, judges, I think the PTO is saying dissolving was known. We dissolve, they melt, and what the PTO is saying is there are others who have shown that D-limonene dissolves ubiquitone. So if your products don't reduce the melting point, then how do they arrive at the desired result? We believe that they dissolve. And if you recall, the 786 patent itself teaches that melting point reduction is a solution for, no pun intended, is a solution for the problem that you can't dissolve D-limonene. It dissolves very poorly, if at all. And that's why they say in the patent, I believe it's A62 and A64, column 1, column 2, and column 6, lines 57 to 60, it says repeatedly that melting point reduction is an alternative to the failed efforts to dissolve. And so we're doing something completely different, we believe, from what's in the patent. But most importantly, JFI had the burden to create a fact issue that melting point reduction limitation was met, and they failed to do so. You have a patent yourself. So what is it that you patented that's different from what they patented? Both of you, both of your patents may very well be invalidated by Motoyama. What I believe, and I'm not prosecuting the patents, Your Honor, not me personally, but I believe that what we have invented is our patent is different because our patent focuses on limonene, and specifically D-limonene, which is not mentioned anywhere in the CON 786 patent in suit. And so our patent says that we've made the remarkable, unusual discovery, the discovery that you can readily dissolve ubiquinone in D-limonene. Which is a volatile essential oil. I believe D-limonene is a volatile essential oil. I thought it was essentially conceded that D-limonene is not any different than the lemon oil in their patent. Let me ask you a different hypothetical though. Suppose your product only had D-limonene and the ubiquinone. But they still hadn't put on any different evidence. If you only had the two, would that be enough to create a tribal issue of fact based upon their Figure 4 in the patent and your ingredients? I don't think so because the evidence that they had on summary judgment was based on a construction that dissolve and melt were used interchangeably. And that's why I understand that. I mean, they're stuck with the claim construction which hurts them here. But they do have evidence showing a combination of ubiquinone and lemon oil lowers the melting point. That's valid evidence for purposes of summary judgment. And hypothetically, if you only had those same two ingredients, isn't that enough for to create a tribal issue of fact for a juror to infirm that if they have this evidence showing it reacts this way and you have the same exact ingredients then yours must react the same way. If our composite if the accused product was only two ingredients and they had timely expert testimony saying that those two ingredients based on test data, if they essentially had test data to back up the melting point, that Well, they do have test data to back up the melting point of the two ingredients in their patent. So I guess what I'm getting at is it seems like the real crux of this is, do the additional ingredients in yours is that enough to defeat or to defeat a tribal issue of fact? Because they haven't given any evidence of how those would interact. It's sufficient to defeat a tribal issue of fact, but that's not the only reason that defeats a tribal issue of fact, Your Honor. And I think I'd like to turn to the cross appeal if I might. And on inequitable conduct, Your Honors If we affirm the district court, wouldn't that motion be moved? The inequitable conduct would not because JFI is continuing to prosecute patents and continuations off of the revived application. And so here I'm sorry, I'm talking about the other side's motion. Oh, on the cross appeal? Your Honor, as I understand the cross appeal rule if I seek relief that expands my client's rights or reduces JFI's rights I need to file a cross appeal. The claims define the meets and bounds of JFI's right to exclude. And I would submit if those are construed more narrowly, they are limited to a true eutectic. JFI's rights are narrowed and my client's rights are expanded. But it's still no infringement. It's still an affirmance of non-infringement. But it's just a different reason for non-infringement. I don't see how that's a valid cross appeal. Maybe I'm getting this wrong, but I think the case you cited the reason that was necessary there was because there was an infringement finding and a validity finding. And those two have different legal effects. But it doesn't matter whether legally the infringement finding or no infringement finding is based upon what the district court found or just a different claim construction. It matters, Your Honor, and it's a valid cross appeal because of this court, if I prevail on the argument that they're limited to a true eutectic, my client's rights are expanded even beyond the products that were accused in this case. My client can make any product that's not a future cases and for certainty of the business people who look at these patents and have to guide their business decisions on the basis of the claim. That's assuming everybody adopts that claim construction going forward. Well, if this court adopts it, I'm sure JFI would argue if I don't prevail on it. They haven't appealed the claim construction. That's right. It's our cross appeal on the construction of eutectic. But again, if we affirm the district court on no infringement, even if we accept that it's a valid cross appeal, and I don't think it is, it's moot, isn't it? You've got a finding of infringement. I would submit it's not moot, Your Honor, because there's a construction that eutectic is not to be given its ordinary meaning and the correction of that. That sounds like you're asking us to issue an advisory opinion on this claim construction when we're affirming a no infringement finding. So you can use it in different cases. I'm merely asking that this court review the district court's construction of that term on a de novo. I'd submit it's not a moot. Isn't it moot if we affirm the district court's no infringement summary judgment grant? I would submit, Your Honor, that it is not moot. And why? Because the part of the judgment below includes the construction of eutectic. And if that construction is changed so it's a true eutectic, it actually has real impact for my client and others in the industry who can make products that don't meet that limitation, that aren't a true eutectic. That sounds like an advisory opinion. You're asking us to rule on something that's not necessary to resolve the case so that you can use it in other litigation. That's kind of the definition of an advisory opinion. I think that Judge the district court below issued a construction and we're just seeking review of that. It's a construction that will potentially be binding on my client in the future and that's why we filed the cross appeal. I see if I could address briefly the inequitable conduct issue, Your Honors. The district court posited two alternative inferences that Anderson could not respond to the office action or thought he couldn't respond to the office action without Kahn's help. Anderson testified that he could have responded without Kahn's help. The district court posited an alternative inference that Anderson could not respond without violating some Texas tech policy. Anderson himself testified that there was no such Texas tech policy. The district court considered all the evidence, did it not? I would submit, Your Honor, the court considered the evidence and carefully reviewed it but I would submit that either the court applied an overly restrictive standard or reached a clearly erroneous decision because Anderson's own testimony is contrary to the alternative inferences that the district court posited and that makes this, in my view, a unique case. The district court said Anderson thought he couldn't respond. Anderson testified that he could have responded in many ways. One of those ways was by authorizing counsel to respond as she recommended when she reported out the office action. Anderson, yeah, he said under the circumstances with a non-cooperative inventor there was no option under the circumstances but he also explained what he meant by that. At A3255 he said, the absence of Kahn heightens the scrutiny in determining whether or not to spend money in light of other files, other opportunities, the total budget of the university. Cooperation is a critical component to de-risking the opportunity. The A3256, this is a business decision that Anderson made that he didn't have a cooperative inventor, he didn't have a commercial partner. I thought there were a lot of findings that Anderson had grown quite reliant on working with Kahn over the prior three year relationship in trying to prosecute the patent application issue and so Kahn was the subject matter expert. Anderson thought he was going to have Kahn's third office action but then Kahn ultimately never really came through and then as time was winding down and they didn't have their subject matter experts they subjectively at that time believed that they didn't really have anywhere to go. Maybe in retrospect there were options that they could have come up with but they had a story to tell that they didn't feel like at that moment in time when the time was running out that they had a viable option and the district court saw that story and felt like it was reasonable. I would submit Judge Chen that Anderson himself testified that at the time there were many ways he could have responded but the story Wrap up within 20 seconds. Your Honor, the story that's in the declaration if you compare that declaration and Anderson's testimony the subjective intent to deceive is the single most reasonable inference and the only reasonable inference. There's nothing to tip the patent office off to the fact that when he said he was unable to respond that he was actually able to respond and chose not to. Nothing to tip the patent office off to the fact that when he said there was a policy, there wasn't a policy there was merely a preference. Time's up. Thank you, Your Honor. Your Honor, I'm going to, if I may if I may not, I will not briefly address No, you may not. I'm going to give your co-counsel you ate up everything but a minute and 47 but I gave an extra minute so I'm going to give you three minutes. Thank you, Your Honor. Good morning. May it please the court Thomas Reckin for the cross appellee in connection with the claim for inequitable conduct. Your Honor, when a case turns on inferences to be drawn from the circumstantial evidence as this one does and when the district court had an opportunity to hear all of the evidence and to judge the credibility of the witnesses before it as the district court had the opportunity here and where there is no claim that the district court improperly admitted or excluded evidence to the prejudice of soft gel, I submit that this court sitting on appeal should not supplant its judgment of the evidence or any inferences it might draw from that evidence. Your co-counsel conceded that the district court carefully reviewed the evidence. Yes, Your Honor. And the district court did. There's a section of the decision as this court knows where the district court not only set forth its findings of fact in considerable detail but also set forth conclusions of law and over the span of three pages carefully considered each and every one of the arguments that was advanced by soft gel. I want to address one point made by soft gel in their final brief where they make the argument that we failed, that JARL formulas failed to address responding in the manner that was suggested by Jennifer Yancey's letter. Jennifer Yancey's letter is in the appendix at A2879. And it's true, we did not address that in our briefing before this court. But the district court did carefully consider and address soft gel's argument in its decision. And that appears at A38 in its findings of fact where it explained why was neither complete nor sufficient. And among other things, did not address the Section 103 obviousness rejection that had issued by the Patent and Trademark Office in January of 2005. In addition, the letter itself makes clear why responding as Jennifer Yancey suggested was insufficient. But even if that was not enough, that is the testimony, excuse me, the findings of the district court predicated upon the plain language of Jennifer Yancey's letter. Attorney Giarratana's trial testimony which is in the record at pages 74 through 77. It is not in the appendix. But it is in Attorney Giarratana's testimony on June 13th. Why would you insist a conscious business decision by your attorneys to abandon this application? By Texas attorneys to abandon this? Because the evidence established, Your Honor, that during the entire three year span here, there was never an intent to abandon this. Maybe not during those three years, but now in the final analysis. I think it comes down to how does the Patent and Trademark Office, in considering a petition to revive, evaluate just precisely what direction that was made or given at the final hour to allow it to go abandoned. We can't dispute that. But the question is, why did that occur? Did it occur because of an intention to proceed and continue to prosecute the patent application through Kahn? And by the time it became apparent Kahn was not going to assist, it was then too late to do anything further. I'm out of time. Thank you, Your Honor. Thank you, counsel.